UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>- v. -<br><br>LAUREN SALZMAN,<br><br>            Defendant. | No. 1:18 Cr. 00204 (NGG)(VMS) |

## SENTENCING MEMORANDUM OF LAUREN SALZMAN

Hector J. Diaz
Quarles & Brady, LLP
Two North Central Avenue
Phoenix, AZ 85004-2391
602-229-5200

Andrea S. Tazioli
6122 N. 7th Street, Suite D
Phoenix, AZ 85014
602.609.7367

*Attorneys for Defendant Lauren Salzman*

## TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND.................................................................................... 3

I.    Lauren's Upbringing and Introduction to Keith Raniere and Executive
      Success Programs......................................................................................... 3

II.   Lauren's Involvement in ESP/NXIVM and Keith Raniere ............................ 5

III.  Lauren's Involvement in DOS ...................................................................... 9

IV.   Lauren's Indictment, Cooperation, Guilty Plea and Testimony at Keith
      Raniere's Trial ............................................................................................ 12

V.    Lauren's Post-Trial Efforts to Commence a New Chapter in Her Life .............. 15

      ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ........................................................ 15

      B.    Lauren Has Embarked on a New Career Path ......................................... 17

      C.    Lauren's Family and Friends Serve as a Strong Support System............ 21

AN EVALUATION OF THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a........................ 22

I.    18 U.S.C. § 3553(a)(1). The Nature and Circumstances of the Offense ............. 23

II.   18 U.S.C. § 3553(a)(1). The History and Characteristics of the Defendant ........ 26

      A.    Lauren's Extraordinary Cooperation with the Government ................... 27

      B.    Lauren's Commitment to Counseling and a New Career Path ............... 30

      C.    Lauren Serves as a Caretaker for Numerous Family Members ............. 31

III.  18 U.S.C. § 3553(a)(2). The Need for the Sentence Imposed ............................ 32

      A.    A Non-Incarceration Sentence for Lauren Will Reflect the
            Seriousness of the Offense, Promote Respect for the Law, and
            Provide Just Punishment for the Offense................................................... 32

      B.    A Non-Incarceration Sentence for Lauren is an Adequate Deterrent
            and Also Protects Public from Further Crimes ......................................... 35

      C.    A Non-Incarceration Sentence Will Best Provide Lauren with
            Treatment Needed In the Most Effective Manner .................................. 37

CONCLUSION.................................................................................................. 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Gall v. United States,
   552 U.S. 38 (2007) .......................................................................................... 22, 32, 37
Pepper v. United States,
   562 U.S. 476 (2011) ..................................................................................................... 27
Rita v. United States,
   551 U.S. 338 (2007) ..................................................................................................... 22
Simon v. United States,
   361 F.Supp.2d 35 (E.D.N.Y. 2005) ........................................................................... 22
United States v. Abraham,
   944 F.Supp.2d 723 (D. Neb. 2013) ............................................................................ 35
United States v. Blake,
   89 F.Supp.2d 328 (E.D.N.Y. 2000) .......................................................... 23, 26, 27, 32
United States v. Blue,
   557 F.3d 682 (6th Cir. 2009) ...................................................................................... 28
United States v. Brady,
   2004 WL 86414 (E.D.N.Y. Jan. 20, 2004) ................................................................ 32
United States v. Bryson,
   163 F.3d 742 (2nd Cir. 1998) ..................................................................................... 23
United States v. Bryson,
   229 F.3d 425 (2nd Cir. 2000) ..................................................................................... 27
United States v. Cadle,
   2009 WL 1764980 (E.D.N.Y. June 11, 2009) ...................................................... 36, 37
United States v. Carbon,
   2013 WL 5728253 (E.D.N.Y. Oct. 22, 2013) ............................................................ 35
United States v. Carpenter,
   320 F.3d 334 (2nd Cir. 2003) ..................................................................................... 36
United States v. Cavera,
   550 F.3d 180 (2nd Cir. 2008) ..................................................................................... 22
United States v. Coello,
   415 F.Supp.3d 306 (E.D.N.Y. 2019) ......................................................................... 31
United States v. DeRiggi,
   893 F.Supp. 171 (E.D.N.Y. 1995) ............................................................................. 23
United States v. E.L.,
   188 F.Supp.3d 152 (E.D.N.Y. 2016) ......................................................................... 35
United States v. Harris,
   349 F.Supp.3d 221 ...................................................................................................... 38
United States v. Hawkins,
   380 F.Supp.2d 143 (E.D.N.Y. 2005) .................................................................... 24, 36
United States v. Joffe,
   2010 WL 2541667 (E.D.N.Y. June 4, 2010) ............................................................. 27

*United States v. Johnson*,
   2011 WL 2387812 (E.D.N.Y. June 8, 2011) ........................................ 36
*United States v. McVay*,
   447 F.3d 1348 (11th Cir. 2006) ...................................................... 28
*United States v. Nesbeth*,
   188 F.Supp.3d 179 (E.D.N.Y. 2016) ........................................... 32, 34
*United States v. Persico*,
   266 F.Supp.3d 632 (E.D.N.Y. 2017) ................................................ 27
*United States v. Stewart*,
   590 F.3d 93 (2nd Cir. 2009) ........................................................ 27

## Statutes

18 U.S.C. § 3553(a) ............................................... 22, 23, 27, 28, 31
18 U.S.C. § 3553(a)(2)(D) ............................................................ 37

## Rules

U.S. Sentencing Guidelines Manual ch. 5, pt. B ................................... 32
U.S.S.G. § 5F1.2 .................................................................. 37

## PRELIMINARY STATEMENT

Lauren Salzman ("Lauren") is a forty-five (45) year old single female with a history of emotional/psychological abuse, as both a participant and victim in Keith Raniere's ("Raniere") criminal schemes.  To be clear, Lauren never envisioned facing her present circumstances. Shortly after graduating from college, she joined an organization she believed, through her efforts and those of others, would change the world.  In her quest to live a principled life and promote personal growth, she believed that ESP/NXIVM was her future.  Her dedication and commitment to achieving the highest human potential also served, in some respects, as her downfall.  A downfall that resulted from a complex and systematic indoctrination that justified her criminal conduct under the misguided perception that she was helping others.

As a twenty-year member of ESP/NXIVM, a first line master in DOS, a former romantic partner of Raniere's, and co-defendant in this case, Lauren provided the government with material and invaluable information regarding Raniere and all co-defendants in this matter.  Lauren's four-day testimony at Raniere's trial was incredibly compelling.  On the stand, Lauren was honest and sincere, and she took full responsibility for the crimes that she committed in this case.  Lauren's trial testimony, coupled with her full and complete cooperation with the government, significantly contributed to Raniere's conviction on all counts.

Lauren's testimony was just one small portion of her cooperation with the government.  In fact, Lauren spent countless hours meeting with the government and preparing for trial.  It was during these lengthy meetings that Lauren demonstrated her commitment to ensuring that the government had a complete comprehension of Raniere's criminal conduct and DOS.  It was clear from these sessions that Lauren had a complete shift in her perceptions—denouncing Raniere and

1

the corrupt NXIVM and DOS practices and exhibiting a full appreciation of the wrongfulness of her conduct.

It has been over two years since Lauren took the stand at Raniere's trial. Since, Lauren has spent these last twenty-six (26) months painstakingly reviewing and reflecting upon the last twenty (20) years of her life as a member of ESP/NVIVM and a devout follower of Raniere. She has been working diligently to overcome and unwind her indoctrination into the program and Raniere's teachings. Specifically, Lauren ██████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ Ltr. (Ex. 1) at 1-2. ███████████████████████████, Lauren has also immersed herself into a new field of work and career path which has been extremely restorative for her as she enters a new chapter in her new life, free from ESP/NXIVM and Raniere. Lauren Salzman Ltr. (Ex. 2). Importantly, Lauren has also spent a great deal of time healing her relationships with family members and close friends. Specifically, Lauren ████████████████████████████████ ██████████████████████████████████, as well her elderly and ailing grandparents. Nancy Salzman Ltr. (Ex. 3); ███████████████ Ltr. (Ex. 4).

To be clear, not a day goes by that Lauren is not remorseful for her conduct. She wholeheartedly regrets her involvement in NXIVM and DOS and further regrets that through her actions, she knowingly propagated Raniere's lies and deceit, and caused harm to so many individuals. Through her rehabilitative conduct and actions over the last two and a half years, Lauren has not only denounced Raniere and his teachings, but she has taken deliberate measures to regain her life back and ensure that she never succumbs to this type of manipulation and psychological abuse ever again.

2

## FACTUAL BACKGROUND

I.     **Lauren's Upbringing and Introduction to Keith Raniere and Executive Success Programs.**

Lauren Rachel Salzman was born on June 26, 1976 in Waterbury, CT, the oldest child of Nancy Salzman and Michael Salzman.  PSR ¶ 199.  During Lauren's childhood, her mother was employed as a nurse, and her father was a physician.  Lauren has one younger sister, Michelle, who is three years younger, and the two resided with both parents until about 1987 when Nancy and Michael decided to divorce.  PSR ¶¶ 200-201.  At the time of the divorce, Lauren was only eleven (11) years old.  PSR ¶ 201.  Lauren and Michelle ultimately resided with their mother following the divorce, however, Lauren visited with her father regularly.  *Id.*  While the divorce was extremely difficult for Lauren, █████████████████████, she remained close with both of her parents throughout her childhood.  *Id.*

With the exception of the divorce, Lauren's childhood was rather ordinary, and she grew up surrounded by numerous extended family members and friends.  Lauren graduated from Shenendehowa High School in Clifton Park in 1994; and three months later, she subsequently attended SUNY Oswego, where she was involved in a variety of campus activities.  PSR ¶ 210.  During her time away at college, Nancy divorced for the second time.  Ex. 2 at 1.  Nancy was extremely depressed after this second divorce, and Lauren watched her mother's emotional stability and self-esteem deteriorate.  *Id.*  It was during this time period that Nancy was introduced to Raniere.  *Id.*  Nancy and Raniere quickly became friends, and Lauren observed that Nancy began to rely on Raniere for advice related to both her employment and personal life.  In fact, Raniere assisted Nancy with implementing a management system program at a nuclear power plant where she worked.  Raniere Trial Tr. ("Tr.") at 1516.  During this time period, it also became very clear to Lauren that Nancy had the utmost admiration and respect for Raniere.  Nancy not only believed

that Raniere was extremely smart, but she also attributed a lot of her successes in her employment to Raniere.  Given Raniere's prominence in her mother's life and her mother's clear admiration for him, Nancy became eager for her children to meet him.  During her senior year of college, while Lauren was home for the holidays in the winter of 1997, Lauren met Raniere for the first time.  A few months later, Nancy hosted a dinner party at her home so that Lauren could finally get to know the man that Nancy came to hold in such high regard, as well as his group of friends.  *Id.* at 1515-1516.  Lauren described her first impressions of Raniere as "a little strange" and that she felt "awkward and uncomfortable around him."  *Id.* at 1516.  However, she disregarded her initial impressions in large part due to the fact that her mother revered him.  Nancy's admiration for Raniere lead Lauren to believe that Raniere was "really good at what he did; that he was really smart and had some…innovative ideas."  *Id.* at 1516-1517.

Lauren graduated from SUNY Oswego with a Bachelor of Arts degree in English in June 1998.  At the time of her graduation, Lauren, like most college graduates, lacked direction and had very little career aspirations.  Ex. 2 at 1.  Lauren ultimately traveled throughout Europe for six weeks with several of her friends before her mother urged her to come home to Clifton Park, New York and begin working with them in their new business.  *Id.* at 1514.  Notably, Lauren learned that her mother and Raniere had started a human potential school called "Executive Success Programs" or "ESP."  *Id.*  The coursework and curriculum in ESP, developed by Raniere and Nancy, was designed to assist individuals with achieving their life goals.  Nancy encouraged Lauren to enroll in ESP, as her mother believed that the ESP curriculum would assist Lauren in figuring out what she wanted to do with her life.  Nancy also made a deal with Lauren: if Lauren attended ESP classes for six months, Nancy would support Lauren no matter what career path Lauren chose to do after the ESP classes.  *Id.*

Lauren dutifully returned home at her mother's request, and she moved back into her childhood home with her mother.  *Id.*  Lauren ultimately enrolled in the first six-week ESP program, which was taught by Raniere and Nancy.  Upon conclusion of the program, and with "blind loving loyalty to her mother," Lauren decided to stay involved with ESP.  *See* Ex. 1.  One of Lauren's oldest friends, Shannon Smith, describes that "Lauren was very eager to be working closely with and for her mother and set out in her career to help others."  *See* ███████ Ltr. (Ex.5) at 1.

## II.    Lauren's Involvement in ESP/NXIVM and Keith Raniere.

From 1998 until her indictment in 2018, Lauren was involved with and employed by ESP, later known as NXIVM.  To be clear, Lauren was involved with ESP/NXIVM for the majority of her adult life—from age 21 to the time of her Indictment at age 42.

Upon the conclusion of the first six-week session in 1998, Lauren became a coach, and she soon began teaching classes and intensives.  Lauren quickly became the Director of Education for ESP/NXIVM and later also served as the head of the division of ethics within ESP/NXIVM called the "stripe path."  Her job responsibilities included helping to open training centers, teaching intensives at various training centers throughout North America, and training ESP/NVIXM staff and coaches.

Early in her involvement with ESP, Raniere took a vested interest in Lauren.  After Lauren moved home with her mother in 1998, Lauren had few friends and spent a lot of time alone. Raniere was well aware that Lauren felt somewhat isolated and alone during this post-college time; and he would regularly call Lauren to check-in on her and would frequently ask Lauren to go on walks with him.  During these interactions, Lauren began to confide in Raniere regarding the struggles that she was having with her family and as well as other events happening in her life.  Tr.

at 1517.  It was these early interactions starting in 1998 that served as the catalyst for the beginning of Lauren's romantic and sexual relationship with Raniere, which began on April 1, 2001.  *Id.* at 1522-1523.  This allowed Raniere to begin grooming Lauren for not only his own prurient sexual interest, but also for what would eventually become Lauren's blind, steadfast and unwavering commitment to Raniere.  At the time that this sexual relationship began, Raniere was sixteen (16) years her senior: Lauren was only twenty-four (24) years old while Raniere was forty (40) years old.

Raniere and Lauren's relationship lasted from 2001 until 2018.  ███████████████ believes that during Lauren's relationship with Raniere, Lauren "was very badly taken advantage of by a cruel man who wanted to control all aspects of her life.  He formed a relationship with her straight after she graduated from college as a highly impressionable young girl."  *See* ████████ ██████ Ltr. (Ex. 6).  During the relationship, Raniere controlled Lauren, and he dictated all aspects of Lauren's life and their relationship.  Raniere made clear that Lauren could not tell anyone, not even her mother, about their relationship.  Ex. 3 at 1.  He demanded that she hide certain aspects of her life.  Raniere required that Lauren be in a monogamous relationship with him (even during a decade long time period when they were not intimate) while he was free to live a polyamorous life and have multiple sexual partners. Tr. at 1527.  Raniere dictated the grooming of her pubic hair, and he took naked photographs of Lauren despite her aversion to doing so.  Tr. at 1536-1537.  Raniere dictated whether he and Lauren would have sex with other individuals, and he initiated these sexual encounters.  *Id.* at 1538.  Lauren was required to ask Raniere's permission before making most decisions in her life, including whether she could travel to visit family members and whether she could receive medical care.  *Id.* at 1529.  Lauren's friend, ████ ███████████ accurately describes Lauren as a "young adult who was released from the structure

that college provided into the arms of a trusted yet nefarious man who forever changed her life." *See* ▮▮▮▮▮▮▮▮ Ltr. (Ex. 7).  By serving as such a controlling force in her life, Raniere was laying the foundation to ensure that Lauren would concede to his demands and never question his intentions.  Lauren has often described these early days in her relationship with Raniere as being in "DOS before DOS."

Raniere's control over Lauren carried over into her work with ESP/NXIVM as well.  As the leader of this group, also known as the "Vanguard," Raniere was not only worshipped by all members, but all members believed Raniere was the most knowledgeable about everything.  If Raniere requested that a member of NXIVM engage in a particular act or activity, then that member was expected to answer Raniere's request and follow Raniere's directions.  It was made clear that members who did not abide by Raniere's rules or directions could not advance within ESP/NXIVM.  This was true for Lauren as well.  In fact, if Lauren did not abide by Raniere's directives, she would not only become stagnant on the stripe path or in her employment, but her failures would be viewed as an "ethical breach."  An "ethical breach" was a belief that Lauren had "compromised her ideology or done something unethical that was damaging or destructive in favor of being mindless or more comfortable or lazy."  Tr. at 1544.

The individuals in NXIVM who had committed an "ethical breach" were subjected to open ridicule, shame, and often shunning by Raniere.  *Id.* at 1875.  Lauren was no exception.  In fact, Lauren often engaged in conduct that she otherwise would not have because she was fearful of having a breach.  Yet, Raniere consistently told her that engaging in his requested activities was important for the advancement of her growth and professional development in the organization. Lauren testified that she believed "Keith understood everything about people's psychodynamics; if Keith observed something and I couldn't see it, it was because I didn't understand and needed

to learn something." *Id.* at 1924.  It was this manipulation by Raniere which influenced Lauren's participation in harboring Jane Doe 4 in a room for almost two years under the threat of potential deportation if Jane Doe 4 did not perform work requested by Raniere, Lauren, and others.  At the time, Lauren could not see that she was engaged in criminal conduct by adhering to Raniere's requests and directives.  Tr. at 1936.  But, looking back, in particular at the crime involving Jane Doe 4, Lauren is filled with disgust and shame regarding this conduct.  *Id.*  She stands by her testimony that out of all of the crimes that she committed, her conduct towards Jane Doe 4 was "the worst thing" she had done in this case.  *Id.*

Raniere made numerous empty promises to Lauren, but most painful was his promise to her that the two would have children together.  Lauren desperately wanted children, but because she was in a relationship with Raniere, she had to wait until he said it was time to do so.  Unfortunately for Lauren, that time never came, and she waited over a decade for Raniere to change his mind.  In 2013, Lauren told Raniere that she wanted to leave her relationship with him and start dating someone else.  *Id.* at 170-1702.  Clearly upset that he would no longer have control over Lauren if she left the relationship, and under the guise that this too was an "ethical breach," Raniere convinced Lauren to stay and told her that he would reinvest in the relationship and promised that the two would eventually have children together.  *Id.* at 1527.  Lauren wanted children very badly, so she chose to stay in the relationship based in part Raniere's promises.  *Id.* at 1559.  In what Lauren can now see was nothing more than gamesmanship, Raniere also threatened to step down as the head of the NXIVM community because of Lauren's transgression, causing Lauren to believe that others would suffer due to her failures, a tenant he later carried into DOS.  Lauren felt responsible for the people in the NXIVM community, and at that time, she could

not reconcile why Raniere would abandon them based solely on her decision to leave their romantic relationship.

Unfortunately for Lauren, Raniere never committed to having children with her, and instead, told her that he was considering having children with another woman, Marianna.  *Id.* at 1702.  Lauren was devastated by this news, but she again agreed to stay faithful to Raniere, even though the two had essentially no relationship and there was no longer a promise of children. Raniere extracted this commitment through leveraging Lauren's desire to be a good person, telling her that love is selfless and if she was really a loving person she would stay strictly out of love without self-interest, meaning with no promise of a relationship or children.

This incessant manipulation by Raniere and her fear of how she and her family would be treated if she left her relationship with Raniere was the basis for Lauren staying in ESP/NXIVM as long as she did.  Ex. 2.  Raniere had his manipulative hooks in Lauren from an early age. Whether it was the nighttime walks in Clifton Park, the countless lessons with Raniere discussing NXIVM principles, or general advice concerning family members, Lauren now recognizes that she was nothing more than a replaceable pawn in Raniere's deranged and narcissistic views of personal relationships.

## III.   Lauren's Involvement in DOS.

In January 2017, two years after DOS had begun, Raniere approached Lauren and told her that he "wanted to make [their] relationship closer."  *Id.* at 1684.  Raniere specifically asked Lauren what she was willing to do for her growth and commitment to him.  Consistent with the nature of her relationship with Raniere, Lauren responded that she was willing to do "anything" as she was "fully committed to [her] growth and fully committed to [Keith].  *Id.*  Raniere told Lauren that some of the other women would be approaching her in the next few days to discuss this new growth

project.  *Id.*  He further explained that the intent was always for her to be a part of this group but did not go into further detail.  *Id.*  Shortly thereafter, Rosa Laura Junco approached Lauren about joining the sorority known as DOS, or the Vow.  Tr. at 1686.  Rosa Laura explained the concept of collateral, which was needed to ensure that Lauren would uphold her vow of secrecy regarding this group.  *Id.*  At the suggestion of Rosa Laura, Lauren submitted naked photographs as her collateral and was told that they would be kept "safe and secure."  *Id.* at 1692.  Following the submission of collateral to Rosa Laura, Keith shared that he had started a sorority with seven founding members, and Lauren was going to be invited to be a founding member (albeit two years after the sorority had started).  PSR ¶ 12; Addendum to PSR at 2.  Rosa Laura then explained the Master/Slave concept to her and informed that Raniere would be Lauren's master and she would be his slave.  *Id.* at 1693-1694.  Rosa Laura further explained additional concepts of DOS, including the vow of obedience that Lauren must make to her master, Raniere; as well as the concept of a collar (necklace), which symbolized a chain to her master.  *Id.*  Rosa Laura also explained that there would be a brand, in the shape of Raniere's initials, to honor the experience of overcoming pain for principle.  *Id.*  Raniere falsely claimed that the women had chosen the idea of a brand and had fashioned the design to include his initials as tribute.  It was not until Raniere was arrested that Lauren learned the idea for branding was Raniere's and shortly before trial that she learned the initials were his idea and not the women's.  At the time, Lauren saw the opportunity to join DOS as the only way to prove to Raniere that she was still committed to her growth and to him.  *Id.* at 1684; Ex. 2.

Once again, Lauren was determined to seek Raniere's approval; Lauren jumped into DOS head-first with her *eyes wide shut*.  She provided her initial collateral of nude photographs and was branded within *three days* of learning about DOS.  Tr. at 1697.  Following her branding, and as a

further sign of her commitment to DOS and to Raniere as her master, Lauren, at Rosa Laura's direction, provided further collateral to collateralize all aspects of her life, including everything material that she owned: her two properties, her two cars, her money, her financial investments, art, as well as intangible things like her position in NXIVM.[1]  *Id.* at 1696.

As part of her commitment to DOS, Lauren was also required to enroll other individuals into DOS.  These individuals would be slaves to Lauren—not to Raniere —and Lauren would be their "Master."  Lauren enrolled six individuals into DOS under the false premise that they were joining a women's empowerment group.  PSR ¶ 12.  Lauren explained the concept of collateral to each of her slaves and told them that they needed to provide collateral in the form of nude photographs or potentially embarrassing and shameful information in order to learn about the organization.  PSR ¶¶ 62-63.  After receiving the initial collateral, Lauren then described the four concepts of DOS: (1) the lifetime vow of obedience to your master; (2) master/slave concept; (3) the collar; and (4) the brand.  Tr. at 1718.  If the potential slave wanted to be part of DOS or the Vow, these slaves were then required to provide additional collateral.  *Id.*  Lauren selected her six (6) slaves with Raniere's input.  Raniere directed Lauren to conceal from her slaves that he had

---

[1] Notably, ten days after Lauren was fully enrolled in DOS and in a lifelong vow of obedience to Raniere, Raniere surprised Lauren and told her that Marianna was pregnant with his child.  Tr. at 1698-1708.  Raniere was aware of this information for over three months and deliberately withheld this information from Lauren prior to her enrollment into DOS.  *Id.* at 1704.  This fact further supports Raniere's full manipulation and control over Lauren.  *Id.*  Moreover, had Keith told Lauren this information prior to her enrollment in DOS, it is very likely that Lauren would not have remained in NXIVM and would not have joined DOS, which would have negatively impacted Raniere.  *Id.*  To be clear, Lauren had been a central figure in NXIVM for years.  As such, her departure would have certainly raised questions about the viability of NXIVM.  Lauren truly believes that Raniere brought her into DOS only because he knew that she would leave NXIVM once she learned Marianna was pregnant.  Raniere's actions in concealing this information until after Lauren joined DOS were not only deceitful and manipulative but demonstrate the lengths Raniere was willing to go to in order to maintain Lauren's blind trust and faithfulness to his initiatives.

any involvement in DOS.  *Id.* at 1717.  Raniere further directed Lauren to conceal from her slaves that the brand contained his initials.  *Id.*  Instead, Lauren was directed to inform her slaves that the brand was a "symbol."  *Id.*  Based on these knowing and intentional misrepresentations, Lauren and other first and some second line DOS masters, wrongfully convinced numerous other women to provide collateral and join DOS.  Similar to the DOS requirements imposed on Lauren, Lauren's slaves were also required to provide collateral, be branded, and abide by the master/slave principles.

## IV.    Lauren's Indictment, Cooperation, Guilty Plea and Testimony at Keith Raniere's Trial.

DOS became public on or about May 2017, just four and one half (4½) months after Lauren had joined DOS.  PSR ¶ 101; Addendum to PSR at 2.  Shortly thereafter, the government began its investigation into DOS, Raniere and the co-defendants in this matter.  On or about April 20, 2018, the government obtained its initial Indictment against Raniere and Defendant Allison Mack ("Mack") charging them with sex trafficking, sex trafficking conspiracy and forced labor conspiracy.  *See* Indictment at DKT. 14.  On or about July 23, 2018, the government obtained a Superseding Indictment, alleging Racketeering Conspiracy and adding four more defendants, including Lauren.  *See* Superseding Indictment, DKT. 50.

During the first few months following her indictment, there was a short period of time that Lauren was still under the delusions created by Raniere that her actions, and the actions of all her co-defendants, were "noble."  In fact, in the early stages of this case, Lauren held firm to the belief that Raniere's conduct was being mischaracterized and exaggerated by the government.  However, after seven (7) months in home confinement and after a meaningful review of the voluminous

discovery[2] and the government's submissions, the walls that Lauren had built around herself (comprised of NXIVM teachings and principles and her dedication to Keith) soon gave way to common sense.  Ex. 2 at 4-5.  For the first time, Lauren was able to step outside of the NXIVM bubble, free from any external influences, and see that Raniere's actions were based on deception, manipulation, and psychological trauma.  Lauren realized that Raniere, her "most important person" and the man she almost took a bullet for in Mexico, had engaged in illegal, unethical and repulsive conduct, which directly contradicted the very teachings and principles that he taught Lauren to uphold.  Tr. at 1507, 1889-1892.  Lauren was able to see the abuse Raniere inflicted on not only her, but others.  Based on everything that she had learned since the time of her indictment, it now became crystal clear to her that she could no longer defend Raniere or sit next to him at the defense table at a trial.  In being honest with herself, and in an effort to take responsibility for all of her actions, Lauren approached the government regarding cooperation in early March 2019.

Lauren was the **first defendant** in this case to proffer with the government, and she began proffering with the government on or about March 17, 2019.  Lauren met with the government on multiple dates—March 17, 18, 23, and 24, 2019—for lengthy proffer sessions before the government extended a Cooperation Agreement to her on March 25, 2019.  During these meetings with the government, Lauren was exceedingly helpful in detailing her involvement in NXIVM and DOS; she provided critical information regarding Raniere and the acts of all defendants in this case.  Specifically, through Lauren's proffers, Lauren "provided the government with detailed information regarding the criminal activities of her co-defendant Raniere and his co-conspirators,

---

[2] In particular, upon her review of emails between Raniere and ███████, coupled with the fact that Lauren had been removed from the grasp of Raniere and NXIVM, Lauren was finally able to appreciate the nature of Raniere's abusive and manipulative tactics.  For the first time, Lauren was able to see that Raniere had treated her in a similar manner to how Raniere had treated ███████. *See* Ex. 2 at 4.

including significant information regarding DOS, the secret organization led by Raniere." Gvt.

Sentencing Memorandum, Jul. 16, 2021, DKT. 1068 at 1. Such detailed information also

specifically included facts about Raniere's involvement in DOS, the activities of the first line DOS

masters, and information regarding the concept of collateral. *Id.* Lauren was able to fully explain

to the government the NXIVM, JNESS and SOP curriculums, and she was able to identify which

specific teachings were contained within each curriculum, which allowed the government an

appreciation of where Raniere was using certain principles for his continued corruption and

manipulation of others. *See, e.g., id.* Lauren provided the government with important information

about the sorority house. Tr. at 1623. Notably, Lauren also provided the government with copies

of the letters that Jane Doe 4 wrote to Raniere while she was confined to a room for nearly two

years. Specifically, Lauren testified that Jane Doe 4 "wrote Keith letters throughout the whole

time she was in the room. And he asked me to keep them. And I did…I kept them and then after

he was arrested, I photocopied them and they became part of the materials in this case." *Id.* at

1968.

       "By virtue of her close, decades-long relationship with Raniere, Lauren was privy to a

significant amount of information regarding Raniere's role in directing criminal activity within the

enterprise, even where Raniere had taken great pains to conceal his role." Gvt's Sentencing

Memorandum at 4. There is no question that Lauren's honesty and lifelong knowledge of the

organization was the basis for her to be called to testify at Raniere's trial. Lauren met with the

government for countless hours on "dozens of occasions, both in proffers and in preparation for

trial testimony." *Id*.

       Because the Court was present for all of Ms. Salzman's testimony, we will not rehash her

statements. However, it bears noting that Lauren's testimony allowed the jury to have a complete

and comprehensive understanding of the complex issues in this case and a first-hand account of Raniere, his manipulation of others, and his criminal objectives.  Lauren testified for four (4) days. For most of her time on the stand, she discussed incredibly sensitive, shameful and embarrassing conduct.  However, testifying at Raniere's trial was a healing process for Lauren as she was able to acknowledge the wrongfulness of her conduct and confront the man who manipulated and abused her for over twenty (20) years.  This was the first and most important step of her recovery and rehabilitation.

## V.   Lauren's Post-Trial Efforts to Commence a New Chapter in Her Life.

After her trial testimony, Lauren experienced significant emotional difficulties and experienced a "devastating recapitulation of the prior two decades of her life."  ██████ Ltr. (Ex. 8).  Lauren's trial testimony was undoubtedly the first and most important step in her rehabilitation process.  ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████

**A.**  ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

[redacted]

> [redacted]

[redacted]

[redacted]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

**B.  Lauren Has Embarked on a New Career Path.**

As discussed in Sections I and II supra, Lauren became involved in ESP/NXIVM at age twenty-one (21), at the encouragement of her mother.  Prior to her indictment, NXIVM was the only professional endeavor that Lauren has ever known.  After her trial testimony, and for the very first time in her adult life, Lauren now had the opportunity to choose her career path, free of any external influence.  ████████████ Ltr. (Ex. 9).  Lauren consciously made the decision to avoid any career path that resembled her prior life in NXIVM.  Instead, she chose to embark on a career that involved caring for and working with animals.

In the fall of 2019, Lauren enrolled as a student in a pet grooming academy in Clifton Park, New York.  While in this program, Lauren completed over three hundred hours of work and ultimately earned a certificate in Professional Dog Styling in November of 2019.  *See* PSR ¶ 211. While attending this certificate program, and in an effort to further bolster her career in this new field, Lauren also began working as a dog groomer at a local pet store.

████████████████████████████ stated:

I met Lauren Salzman in September of 2019 where we both attended

Grooming School ███████████████████████ in Clifton Park.

During the course Lauren was always on time and displayed such love,

compassion, and devotion to the animals that she worked on and the other students, including myself.  It was this love and kindness that led me to offering Lauren a position within my company.

*See* ██████████████████ Ltr. (Ex. 10).



██████████████████████████████████, states that Lauren shows dedication and compassion to her career and customers.  Specifically, ██████████████ comments that:

Lauren is an extremely hard worker and takes her career very seriously. Lauren is always hoping and finding ways to better herself with education to grow her skills and career path.  She is compassionate and genuinely cares about all the dogs and customers that enter ██████████████.  She goes above and beyond every day to make other collaborators smile and enjoy their day.  Her commitment and positivity towards her skill inspires me and encourages me to better myself.

*See* ██████████████ Ltr. (Ex. 11).

While working as a dog groomer, Lauren also completed the four additional certificate programs and earned certifications of completion of all four programs.  These programs included: (1) Course Certificate for Dog Emotion and Cognition from Duke University, April 30, 2020; (2) Certificate of Completion for the Science of Skin Learning Series from IV San Bernard USA dated May 14, 2020; (3) Course Certificate for Animal Behavior and Welfare from the University of Edinburgh, Oct. 21, 2020; and (4) Certificate of Completion as an ABC Certified Dog Trainer from the Animal Behavior College, March 17, 2021.  PSR at ¶ 211; Addendum to PSR at 1. Lauren's commitment to her new career had a tremendous impact on those with whom she worked as well.  Her fellow co-workers have described her as "hardworking, outgoing, compassionate and

warm-hearted;" and they admire her "dedication" to her new career. ██████ Ltr.  (Ex. 12); ████████ Ltr. (Ex. 13); ████████ Ltr. (Ex. 14).  And the customers with whom Lauren interacts are "impressed with her knowledge" in her new field. ██████ Ltr. (Ex. 15).

      While Lauren excelled in her work at ████████, Lauren also had a strong desire to start her own pet grooming and skin and coat therapy services business, and she began to develop the business which she incorporated on or about May 2020, ████████.  PSR ¶ 212. Lauren left her employment with ██████ on or about March 2021 so that she could focus more of her time on developing her business.  Seeking to further her entrepreneurial efforts, Lauren has even reconfigured a portion of her home to allow for a full dog bath and grooming area.  *See* ████████ Ltr. (Ex. 16).  Over the last several months, Lauren has been taking on customers for pet grooming as well as skin and coat disorders.  One of Lauren's customers, ████████, believes that Lauren is incredibly talented in her new career path:

> I reached out to the animal wellness business and Lauren immediately got back to me to schedule an appointment.  I went two weeks later to Lauren's home with [my dog].  I was greeted by Lauren and we sat down and she explained the dog grooming process so I knew what to expect.  She took time to text me updates after I dropped [my dog] off.  Lauren was very gentle, patient and loving with [my dog].  When I picked her up, Lauren gave me a bag of homemade products for [her] specific skin condition and explained the condition and treatment thoroughly.  She went above and beyond in the whole process.  I have since brought [my dog] back for more

treatments, as I am seeing a major improvement in her skin condition. Lauren has an in-home business with a dedicated room that includes a dog grooming table and professional stainless steel bathtub with a ramp. Lauren's heart has been dedicated to helping animals. It shows. I referred by best friend to Lauren, who has been to many groomers, and we both agree that we will always go to Lauren for the grooming needs of our fur family.

Ex. 16.

In order to ensure that she is meeting her monthly expenses while she is starting her own business, Lauren also began part-time dog grooming work at ████████████████████ ████████████. Her employer, ████████, describes that Lauren's "attentiveness to every animal is authentic and sincere," and she praises Lauren for bringing "her knowledge of skin and coat care to [her] business." ████████ Ltr. (Ex. 17). Her coworker, ████████, boasts that Lauren is a "valuable member" of the staff and truly believes that "Lauren's work with animals has helped her during a very difficult time as she comes to terms with her mistakes and work[s] hard to move forward." ████████ Ltr. (Ex. 18).

It is clear from these letters that Lauren has a passion for working with animals, and she is excelling in this line of work. This is in large part due to the fact that for the first time in her adult life, Lauren has grabbed the reins and has directed her life in the manner she sees fit. She has taken the initiative to obtain the proper schooling, certifications, and training needed in order to open her own business. It is rather remarkable that in just two short years, Lauren has completely shifted her career path and has excelled as a budding entrepreneur. Ex. 9. What is even more remarkable is that Lauren has humbly shared her past misconduct with her fellow colleagues. In

doing so, she has demonstrated through her words and actions that she is remorseful for her conduct. Lauren's employers and colleagues have embraced Lauren and her mistakes with open arms, are empathetic to the circumstances surrounding her guilty plea, and want nothing but the best for her as she starts anew. *See, e.g.,* Ex. 9-18.

### C. Lauren's Family and Friends Serve as a Strong Support System.

Lauren's family has served as a significant source of strength for her throughout the last several years. While Lauren has always loved and cared for her family members, she now has a much deeper, profound and unconditional love for her family. Specifically, Lauren has been committed to caring for her ill family members, and she is constantly relied upon and depended upon by these family members. As this Court is aware, ███████████████████████ █████████████████████████████████████████████████ ████████████████████████ Ex. 3. This Court has also graciously granted Lauren permission to visit regularly with her elderly grandparents in order to assist them with their medical care. Her brother-in-law confirms that Lauren is ████████████████████████ ████████████████████████████████████ Ex. 8. Most recently, ████████████████████████████████████ Ex. 4. ████████████████ ████████████████████████████████████████████ ████████████████ Ltr. (Ex.19).

Additionally, Lauren has taken this opportunity to rekindle friendships with some of her oldest friends. Ex. 5, Ex. 7. Raniere often forbade Lauren and other NXIVM members from having any semblance of a friendship or relationship with individuals who were not a part of NXIVM. ██████████████ Ltr. (Ex. 20). As a result, Lauren allowed many of her closest

friendships to fall by the wayside.  Fortunately, several of Lauren's oldest friends reached out to her during the pendency of this case and stood by her side in her time of need.  ███████ Ltr. (Ex. 21).  These friends not only watched Lauren confront Raniere and testify against him, but they have witnessed her walk away completely from NXIVM and Raniere and begin her new life. ████████████ Ltr. (Ex. 22).  Lauren's friends have also witnessed Lauren's full and complete acceptance of responsibility for her criminal conduct and her deep remorse about her participation in DOS and Raniere's initiatives.  █████████ Ltr. (Ex. 23); ████████ Ltr. (Ex. 24).  It says a great deal about Lauren's character that so many of her family members, friends, coworkers, and even customers have supported Lauren, recognized her positive qualities, and helped her emerge from one of the darkest moments in her life.  ████████ Ltr. (Ex. 25); *see also* Ex. 3-25.

Importantly, the last three years mark the first time that Lauren has been able to live out from under the umbrella of Raniere's teachings.  Her three years in home confinement have allowed Lauren the opportunity to not only rediscover her true self, but to rekindle her familial relationships and friendships.

## **AN EVALUATION OF THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a)**

The Sentencing Guidelines are no longer mandatory, and a sentencing court may depart from the Guidelines in the interest of justice.  *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *United States v. Cavera*, 550 F.3d 180, 187-89 (2nd Cir. 2008).  A sentencing court does not presume that a guidelines sentence is reasonable; instead, the sentence recommended by the guidelines provides a starting point which the Court considers along with the § 3553(a) sentencing factors.  *Rita v. United States*, 551 U.S. 338, 351 (2007); *Simon v. United States*, 361 F.Supp.2d 35, 40 (E.D.N.Y. 2005) (holding that a court should give the Guidelines "the same weight accorded to each other [§ 3553(a)] factor").  After reviewing these factors, the Court must "make an

individualized assessment based on the facts presented." *Gall,* 552 U.S. at 50. The sentencing court must "impose a sentence sufficient, but not greater than necessary to comply with the purposes of" sentencing as described in 18 USC § 3553(a)(2). The Court should impose the least severe sanction necessary to achieve the purposes of punishment established by Congress in § 3553. *United States v. DeRiggi*, 893 F.Supp. 171, 182 (E.D.N.Y. 1995).

This District has embraced the view that the "utilization of non-incarcerative sentences needs to be increased." *United States v. Blake*, 89 F.Supp.2d 328, 346 (E.D.N.Y. 2000). A departure from the guidelines is especially warranted in an atypical case such as this because the Guidelines were only created as a "framework applicable to a 'heartland' of typical cases--embodying the conduct that a given guideline describes." *United States v. Bryson*, 163 F.3d 742, 746 (2nd Cir. 1998). When conducting an individualized assessment and analysis of the § 3553(a) factors as they pertain to Lauren, and when taking into consideration Lauren's extraordinary cooperation as detailed in the Government's Sentencing Memorandum, we respectfully submit that the Court should impose a non-incarceration sentence for Lauren.

## I.    18 U.S.C. § 3553(a)(1). The Nature and Circumstances of the Offense.

This case presents a unique set of facts and circumstances for all defendants, but it does so particularly for Lauren. In order to fully understand Lauren's criminal conduct, it is important to consider that her mother, Nancy Salzman, introduced her into the ESP/NXIVM organization after she graduated from college. Her mother played a critical role in Lauren becoming employed with the company, advancing professionally, and staying involved with the company for over twenty years. It is also important to consider Lauren's lengthy and abusive relationship with Raniere, and how his manipulation and control overpowered her own belief system and contributed to the commission of the crimes in which she pled guilty. Indeed, courts in this district have recognized the influence that a defendant's family and romantic partners may have on a defendant's criminal

conduct. *United States v. Hawkins*, 380 F.Supp.2d 143, 164 (E.D.N.Y. 2005) ("It behooves us not to underestimate the extreme pressures a young person is under trying to extricate himself or herself from a family with a criminal background. . . and from a paramour who is a longtime criminal.").

Lauren was brought into ESP/NXIVM by her mother when she was only twenty-one years of age. As a recent college graduate, Lauren was eager to not only have a career, but to develop her personal and professional identity. ██████████████████████████████████████ ████████████████████████████████████████████████ ████████████ Ex. 1 at 3. Lauren was also eager to become involved in what she perceived to be a progressive endeavor, mostly because of her mother's tireless work in developing the organization.

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████

*Id.* at 2-3.

The fact that her mother not only introduced her into ESP/NXIVM, but that her mother also developed the curriculum with Raniere explains why Lauren was so committed to ESP/NXIVM and its teachings. Throughout her life, Lauren has always sought her mother's approval and being asked to join ESP/NXIVM was the ultimate form of acceptance in her eyes.

██████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████   For Lauren, there is no question that her involvement with ESP/NXIVM was a way for her to bond with and strengthen her relationship with her mother.

In addition to her mother's influence over Lauren in her young adult life, Raniere also interjected himself into Lauren's life as a friend, confidant, and lover.  In her letter to the Court, Lauren details how the "subtle abuse and manipulation by Keith started early and continued throughout [her] time in NXIVM and DOS."  *See* Ex. 2 at 3.  Keith's manipulation of Lauren as a young adult and her indoctrination into his teachings and abuse tactics are issues that were seen by individuals within NXIVM and beyond.  This is further detailed in the numerous character letters provided herewith, ██████████████████████████████████████████████

████  *See, e.g.,* Ex. 2-9, 19-24.  While not always apparent to her or subtle in his efforts, Keith's victimized Lauren through his psychological abuse which spanned for almost twenty years.  ██

███████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████

██████████████████

Lauren's die was cast as a young adult.  She could not have removed herself from NXIVM because at a very early stage within NXIVM, her life became intertwined with the leadership of

this organization.  Lauren's mother was a co-founder of NXIVM, and Keith, its philosophical leader, was her romantic partner.  Lauren was personally and professionally committed to NXIVM. Lauren's group of friends were all part of NXIVM, because, due to Keith's direction she was unable to "maintain close friendships outside of NXIVM."  Ex. 5 at 2.  In essence, if Lauren were to leave NXIVM, she would not only be leaving her mother and Keith, but she would be forced to give up her employment, as well as her only group of friends.  At the early stages of her involvement in NXIVM, ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████  Ex. 1 at 3.  Lauren understood that leaving Keith and the organization would be incredibly detrimental to her life, as she would almost certainly be left with nothing—no family, no job, and no friends.

To be clear, Raniere's strong influence over Lauren and his manipulative tactics do not excuse Lauren's criminal conduct; however, it provides "useful context" to understanding what set her "upon her illegal course."  *Blake*, 89 F.Supp.2d at 332.  Lauren is completely aware that she engaged in immoral, reprehensible, and illegal conduct while she was associated with NXIVM and later DOS.  Upon her full recognition that she and others committed crimes, she pleaded guilty to these crimes in an effort to take responsibility for her conduct.  During her allocution to the Court and during her trial testimony, Lauren fully admitted and embraced the wrongfulness of her conduct and showed remorse.  And to this day, she remains incredibly remorseful.

## II.    18 U.S.C. § 3553(a)(1). The History and Characteristics of the Defendant.

Prior to the criminal acts committed in this case, Lauren lived a law-abiding life and had no criminal history.  As explained in detail above, although Lauren committed horrific crimes, she did so under Raniere's thumb and his incredible coaxing that her conduct (while illegal) was intended to foster and contribute to her personal growth.  Ex. 2.  Since her indictment, however,

Lauren has gone to incredible lengths to rehabilitate herself and demonstrate that she is no longer the person who engaged in such abhorrent conduct.

Sentencing courts should consider the "widest possible breadth of information about a defendant" to ensure that the sentence imposed suits the individual defendant. *United States v. Persico*, 266 F.Supp.3d 632, 635 (E.D.N.Y. 2017) (*quoting Pepper v. United States,* 562 U.S. 476, 488 (2011)). A court must sentence a defendant "as [s]he stands before the court on the day of sentencing." *United States v. Bryson*, 229 F.3d 425, 426 (2nd Cir. 2000). To that end, a defendant's conduct after being charged with a crime is highly relevant to the court's analysis. A defendant's pre-sentencing rehabilitation efforts often justify a downward departure from the guidelines, especially in a case such as this where the defendant has "taken responsibility for [her] actions and acted to reintegrate [herself] into a productive society." *Blake*, 89 F.Supp.2d at 346.

### A.    Lauren's Extraordinary Cooperation with the Government.

Lauren's cooperation with the government justifies a downward departure from the guidelines. Her proffer sessions with the government began prior to her guilty plea, and her cooperation was extensive and culminated with her testimony in support of the government's prosecution. *See United States v. Joffe*, No. 08-CR-206, 2010 WL 2541667, at *2 (E.D.N.Y. June 4, 2010) ("The court departed from the guidelines. . . in light of the fact that defendant's early cooperation enabled investigators. . . to understand the methods by which the fraudulent scheme was accomplished."). In its Sentencing Memorandum, the government detailed Lauren's substantial assistance, which occurred two months prior to Keith Raniere's trial. *See* Gvt. Sentencing Memorandum. This substantial assistance contributed to Keith Raniere's conviction on all counts. Moreover, the Court may also assess a defendant's cooperation, separate from the § 5K1.1 analysis, under 18 U.S.C. §3553(a). *See United States v. Stewart*, 590 F.3d 93, 141 (2nd

Cir. 2009) (observing that the "use of a defendant's cooperation to justify significant variances or departures from the otherwise applicable Guidelines calculations is commonplace."); *United States v. Blue*, 557 F.3d 682, 686 (6th Cir. 2009) ("This means that post-*Booker*, the government's failure to file a Section 5K1.1 departure does not necessarily preclude a sentencing court from taking into account substantial assistance when considering the appropriate sentence in light of the Section 3553(a) factors."); *United States v. McVay*, 447 F.3d 1348, 1356 (11th Cir. 2006) ("Moreover, after it has decided the length of departure warranted by the substantial assistance motion, the district court is then obligated to take into account the advisory Guidelines range and the sentencing factors set forth in 18 U.S.C. § 3553(a) in fashioning a reasonable sentence.").

Once Lauren made the decision to cooperate with the government, she fully committed to this endeavor and spent countless hours explaining the nature of the criminal enterprise and related conduct. Lauren "admitted her involvement in the crimes in which she was charged…including some criminal activity as to which the government was previously unaware." *Id.* Lauren "met with the government on dozens of occasions, both in proffers and preparation for trial testimony, and answered all the government's questions, including questions about the crimes she committed as well as criminal activity engaged by her close friends and family members, including her mother." *Id.* at 4.

Lauren also served as a material witness for the government in Raniere's trial, and her testimony spanned for four days. Tr. 1504-2270. Lauren's detailed testimony covered the following areas: "(1) Raniere's leadership of the racketeering enterprise; (2) Raniere's orders to confine [Jane Doe 4] to a room, without human contact, for nearly two years; (3) Raniere's role as the "Grandmaster" in DOS; (4) Raniere's direction that several DOS "slaves" be assigned to have sex with him; (5) efforts by Raniere and Clare Bronfman to discredit DOS victims and lie about

Raniere's involvement in DOS; and (6) statements regarding Raniere's efforts to secure a "virgin successor" as a replacement for ████.'' Gvt. Sentencing Memorandum at 4.  The government made clear that Lauren's cooperation was "critically important" in not only securing Raniere's conviction, but it was also "highly likely" that her guilty plea was a factor in her co-defendants' respective decisions to plead guilty.  *Id.* at 5.  The government even went so far as to state that the "extent of Lauren Salzman's cooperation and the significance of her assistance to the government were ***extraordinary***."  *Id.* at 1 (emphasis added).

In addition, Lauren's trial testimony was incredibly important



Lauren's trial testimony likely also alleviated the need for the government to call these victims, as well as her other first line DOS members, as witnesses at trial.  The government also recognized the impact that Lauren's testimony had on the victims in this case and stated in its Sentencing Memorandum that her testimony "achiev[ed] a measure of closure for Raniere's victims."  Gvt. Sentencing Memorandum at 4.

Lauren was the first defendant to cooperate, and she was the only defendant to testify.  Her cooperation began a full two months prior to trial.  *Id.* at 5.  Once Lauren decided to cooperate, she was "all in."  She repeatedly met with the government, sometimes in all day sessions without any reservations.  *Id.*  Lauren was fully committed to her cooperation despite that doing so meant that she was forced to confront the painful truths that she had buried deep inside of herself for so many years.

**B.      Lauren's Commitment to Counseling and a New Career Path.**

In addition to Lauren's cooperation and trial testimony, Lauren has taken serious, rehabilitative efforts to ensure that she never again engages in any criminal conduct.  As detailed in Section V(A) supra, ███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████

Moreover, Lauren's new career path—free from NXIVM practices and prior NXIVM members—has also assisted with her rehabilitation efforts.  Lauren has been able to devote all of her time during the last two years into learning about and caring for animals.  As evidenced by the numerous characters herein from her employers and co-workers, Lauren's work in this new field

has been exemplary.  In her new career path, Lauren has also been able to build "consistent and positive relationships" with those around her, which has been a significant part of her rehabilitation process.  Ex. 2 at 6.

### C.    Lauren Serves as a Caretaker for Numerous Family Members.

The Court should also consider a defendant's family circumstances at the time of sentencing when determining an appropriate sentence under 18 U.S.C. § 3553(a).  *United States v. Coello*, 415 F.Supp.3d 306, 310 (E.D.N.Y. 2019) (noting that, post-*Booker*, courts may give more weight to the "crucial consideration" of familial relationships).  Since the inception of this case, ████████████████████████████████████████████████

████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

31

These efforts have not only been rewarding and have enriched Lauren's life while on home detention, but have also allowed her to reconnect with her family without the prior constraints imposed by NXIVM and Keith.

**III.**    **18 U.S.C. § 3553(a)(2). The Need for the Sentence Imposed.**

    **A. A Non-Incarceration Sentence for Lauren Will Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense.**

In this case, a non-incarceration sentence for Lauren will not only reflect the seriousness of her offense, but will also provide just punishment. Indeed, a sentence of probation is not "an act of leniency," but rather a "substantial restriction of freedom." *Gall*, 552 U.S. at 44; *see also United States v. Nesbeth*, 188 F.Supp.3d 179, 195 (E.D.N.Y. 2016) (imposing a period of six months' home confinement to "drive home the point" that the court "consider[ed] her crimes to be serious"). Probation is both rehabilitative and punitive and "may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing." *United States v. Brady*, No. 02-CR-1043(JG), 2004 WL 86414, at *9 (E.D.N.Y. Jan. 20, 2004) (quoting U.S. Sentencing Guidelines Manual ch. 5, pt. B, introductory cmt.). Here, the Court can certainly impose probation terms which require that Lauren continue to meaningfully engage in her rehabilitative efforts, ███████████████, to ensure that she continues down this transformative path.



[redacted]

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

       ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

       ████████████████████████ the collateral consequences that Lauren will face

following her felony convictions also bear upon the court's determination of just punishment.

*Nesbeth*, 188 F.Supp.3d at 188 (imposing a sentence of probation because the collateral

consequences of the defendant's felony conviction, including her likely inability to pursue her

chosen career as an educator, "compelled" the court to conclude that the defendant had been

sufficiently punished).  Lauren has effectively lost everything as a result of her indictment and

subsequent convictions: her job, her financial stability, friends, and even some family members.

While she has worked tirelessly to rebuild her life, the damage and loss that she has suffered cannot

go unnoticed.  Lauren continues to suffer financial difficulty.  PSR ¶ 224.  Lauren has further

suffered at the hands of relentless media outlets whose obsession with this matter has caused harm

to most of the Defendants in this case, but in particular Lauren, who previously never had any

media exposure.  At the inception of this case, the media outlets were constantly outside of

Lauren's residence.  Given that Lauren still resides in Clifton Park, she is regularly noticed by fellow Clifton Park residents and the subject of targeted "hit pieces" by the media.  Though Lauren was not charged with or convicted of any sex-related offenses, she has faced a social stigma because of the extensive media attention garnered by NXIVM that labeled her as a member of a "sex cult."[3]  *See United States v. E.L.*, 188 F.Supp.3d 152, 173 (E.D.N.Y. 2016) (recognizing the harsh stigma that accompanies a sex offense).

### B. A Non-Incarceration Sentence for Lauren is an Adequate Deterrent and Also Protects Public from Further Crimes.

As previously stated, probation is not a lenient punishment and constitutes a substantial loss of personal freedom.  The punishment Lauren has already received, along with the collateral consequences she will continue to suffer as a convicted felon, provide adequate general deterrence, especially in light of the extensive media coverage of this case.  *See United States v. Carbon*, No. 12-CR-680, 2013 WL 5728253, at *2 (E.D.N.Y. Oct. 22, 2013) (sentencing the defendant to probation after concluding that the defendant's felony conviction and its collateral consequences provided adequate general deterrence).  As discussed above, by being charged with these crimes and in subsequently pleading guilty, Lauren has suffered incredible loss and hit "rock bottom." PSR ¶ 204.  Experiencing such significant losses and pain, as well as the incredible efforts that it took Lauren to begin her rehabilitation process, and come out with a semblance of her former self-identity, serves as a significant specific deterrent for Lauren.  Moreover, the pure and utter humiliation that she has had to endure on a daily basis also provide adequate specific deterrence. *United States v. Abraham*, 944 F.Supp.2d 723, 738 (D. Neb. 2013) (imposing a below-guidelines

---

[3] "Woman Implicated in NXIVM Sex Slave Case Pleads Guilty." Mar. 29, 2019, CBS, https://www.cbsnews.com/news/lauren-salzman-implicated-nxivm-sex-slave-case-quietly-pleads-guilty-2019-03-29/.

sentence after noting that the defendant had already suffered the "serious consequence" of the stigma of a felony conviction "in a small community").  Further, this district also frequently finds specific deterrence unnecessary in cases like this where the defendant has undertaken extraordinary pre-sentencing efforts at rehabilitation and where the defendant has fully cooperated with the government.  *United States v. Cadle*, No. 04-CR-750, 2009 WL 1764980, at *2 (E.D.N.Y. June 11, 2009); *United States v. Johnson*, No. 09-CR-81, 2011 WL 2387812, at *2 (E.D.N.Y. June 8, 2011).

Imposing a sentence to protect the public from Lauren is unnecessary considering her successful rehabilitative efforts.  *Hawkins*, 380 F.Supp.2d at 165.  As detailed above, Lauren's efforts with regards to counseling, starting a new career, and redeveloping her relationship with her family and friends demonstrate that she will not reoffend. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████

The Court should also consider the time that Lauren has already spent on house arrest when fashioning a sentence that reflects just punishment.  *United States v. Carpenter*, 320 F.3d 334, 345-46 (2nd Cir. 2003) (acknowledging that time served in home detention may be appropriately considered when determining what constitutes just punishment).  On July 26, 2018, the Court placed Ms. Salzman on home confinement.  Ms. Salzman has been on home confinement for three years, and her supervising Pretrial Services Officer has reported that Lauren "has complied with

all Court-ordered conditions of release." PSR ¶ 4. If the Court is inclined to sentence Lauren to a term of imprisonment, Lauren respectfully requests that the Court consider a sentence of home detention pursuant to U.S.S.G. § 5F1.2 in order to allow her to continue to address her rehabilitation efforts. As demonstrated above, Ms. Salzman has had no issues while on home confinement, and she could clearly comply with the parameters and restrictions of home detention should the Court order such a sentence.

### C. A Non-Incarceration Sentence Will Best Provide Lauren with Treatment Needed In the Most Effective Manner.

18 U.S.C. § 3553(a)(2)(D) instructs the court to consider the most effective manner of providing the defendant with "needed educational or vocational training, medical care, or other correctional treatment" when fashioning a sentence. Probation adequately serves these goals in cases like this where Lauren is "doing everything in [her] power to forge a new life." *Gall*, 552 U.S. at 44. Notably, Lauren has once again sought to further her education. Over the last two years, she has taken additional classes and trainings in order to receive various certificates needed to begin her new career path in working with animals. Lauren has also used the tools learned in these certificate programs in order to begin her own business. A non-custodial sentence will best serve Lauren's ongoing rehabilitative efforts, including her efforts to continue to reconnect with her family and community network. *Cadle*, 2009 WL 1764980, at *2 (imposing a sentence of probation after acknowledging defendant's pursuit of education and devotion to her family).

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

         ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

## <u>CONCLUSION</u>

In closing, Lauren fully appreciates that she has committed egregious acts.  She has admitted to this conduct and takes full responsibility for her crimes.  Lauren is also fully aware that she has harmed many individuals—most of whom she considered to be her very closest friends—and this continues to cause her pain and anguish.  However, Lauren has made incredible strides to forge her own path, free from Raniere and NXIVM.  Her cooperation and testimony at trial, her immersion into counseling, her new career path, and her willingness to care for her ailing family members all demonstrate that she is committed to rehabilitation.  For these reasons, we respectfully request that the Court impose a non-incarceration sentence.

Dated:      July 23, 2021
                 Phoenix, Arizona

                                      Respectfully submitted,
                                      /s/  Hector J. Diaz
                                      Hector J. Diaz
                                      Quarles & Brady, LLP
                                        Two North Central Avenue
                                        Phoenix, AZ 85004-2391
                                        602-229-5200

                                    /s/ Andrea S. Tazioli
                                      Andrea S. Tazioli
                                      KW Law, LLP
                                    6122 N. 7th Street, Suite D
                                    Phoenix, AZ 85014
                                    602-609-7367
                                    *Attorneys for Defendant Lauren Salzman*